1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    PIERRE L. HOFFMAN,                         No.  2:14-cv-1009 MCE DB P

12                    Plaintiff,

13          v.                                   ORDER AND

14    TRUONG QUACH, et al.,                      FINDINGS & RECOMMENDATIONS

15                    Defendants.

16

17          Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights

18    action pursuant to 42 U.S.C. § 1983. This action proceeds on plaintiff's April 24, 2014, complaint

19    against defendants Dr. Truong Quach, Nurse Martha Jolley, Nurse Dixie Harper, Nurse Phillip

20    Mallory, and Nurse Allan Jennings on Eighth Amendment medical indifference claims.

21          Before the court is defendants' motion for summary judgment, which seeks judgment as a

22    matter of law as to each defendant. Defendants also argue that each is entitled to qualified

23    immunity. Plaintiff opposes this motion.

24          Also pending are plaintiff's March 24, 2016, "pre-trial motion" (ECF No. 27); June 8,

25    2016, motion for court order (ECF No. 34); and June 8, 2016, motion for extension of time (ECF

26    No. 35).

27    ////

28    ////

                                              1

1    **I.      Relevant Procedural Background**

2          Plaintiff initiated this action on April 24, 2014. On May 27, 2015, the complaint was

3    screened and found to state cognizable claims against Dr. Quach, Nurse Jolley, Nurse Harper,

4    Nurse Mallory, and Nurse Jennings. (ECF No. 12.) The defendants were then served, and they

5    filed their answers on October 5 and November 19, 2015. (ECF Nos. 15, 17, 23.) A discovery and

6    scheduling order issued on October 14, 2015. (ECF No. 18.)

7          On May 27, 2016, defendants filed the pending motion for summary judgment. (ECF No.

8    32.) Plaintiff then filed a request for extension of time to file an opposition on June 8, 2016, and

9    he filed his opposition on July 19, 2016. (ECF Nos. 35, 38.) Plaintiff's motion for extension of

10   time will be granted and plaintiff's opposition deemed timely filed. On July 27, 2016, defendants

11   filed a reply. (ECF No. 39.) This matter is fully briefed and ready for disposition.

12   **II.     Plaintiff's "Pre-Trial" Motion**

13         On March 24, 2016, plaintiff filed a "pre-trial motion," which does not conform to any

14   motion anticipated by the Federal Rules of Civil Procedure or the court's local rules. (ECF No.

15   27.) While the filing resembles a motion for summary judgment pursuant to Federal Rule of Civil

16   Procedure 56 in that it includes extensive assertions of fact, it fails to comply any of the

17   requirements of that Rule or Local Rule 260(a). Specifically, it fails to "cit[e] to particular parts

18   of materials in the record" to support plaintiff's many factual positions, Fed. R. Civ. P.

19   56(c)(1)(A); it is not supported by the submission of any evidence or declarations / affidavits, id.;

20   and it fails to include a separate "Statement of Undisputed Facts," E.D. Cal. Local Rule 260(a).

21         At best, the filing can be construed as an amended complaint in that it is formatted to look

22   like a pleading; it describes the roles of the defendants based on plaintiff's information and belief;

23   it indicates that plaintiff is suing the defendants in their individual and official capacities; it

24   includes no legal citation; and it concludes with a "Prayer for Relief." Insofar as this filing is a

25   request to amend the complaint, it will be denied because it fails to comply with Federal Rule of

26   Civil Procedure 15(a) and Local Rule 137(c) in that it fails to seek leave of court and fails to

27   demonstrate good cause. Accordingly, this "pre-trial motion" will be denied.

28   ////

1    **III.    Plaintiff's Motion for Court Order**

2         Also pending is plaintiff's June 8, 2016, "Motion to order respondent Mr. S. Pass to stop

3    manipulating the Dept., of Corrections at CHCF's legal mail process by deliberately exposing

4    plaintiff's legal transcripts to all custody and staff for them to read." (ECF No. 34.)

5         There, plaintiff accuses former counsel for the defendants, Stephen Pass,[1] of deliberately

6    failing to comply with "Tit. 15 § 3143(a)(b)," which appears to be a reference to California Code

7    of Regulations, tit. 15 § 3143, "Processing Incoming Confidential Mail." That provision provides,

8    in relevant part, that "Incoming letters must show the name, title, return address and the office of

9    persons listed in Section 3141 on the outside of the envelope to be processed as confidential

10   correspondence." Plaintiff claims defense counsel sent the May 27, 2016, motion for summary

11   judgment in an unmarked envelope with no return address, and that this envelope was then

12   opened and inspected by institutional staff, rendering plaintiff subject to retaliation.

13        Defendants claim that communications with an attorney for an opposing party do not fall

14   within the purview of § 3143. (ECF No. 36.) This is not necessarily true. As defined under CCR

15   tit. 15 § 3141, "Persons and employees of persons with whom inmates *may* correspond

16   confidentially and from whom inmates *may* receive confidential correspondence include: [¶] (6)

17   An attorney at law, on active status or otherwise eligible to practice law, listed with a state bar

18   association." (Emphasis added.) There is no limitation to attorneys representing an inmate or

19   exclusion of opposing counsel. This regulation further provides that "[a]ll incoming confidential

20   mail from an attorney or legal service organization shall include the attorney's name, title, and

21   return address of their office." Id. § 3141(d).

22        In any event, assuming counsel for defendants failed to include his name and address on

23   the outside of the envelope, this would be a violation of the regulations only if he intended the

24   packet "to be processed as confidential correspondence." There is no requirement that it be

25   processed as such. Additionally, since Mr. Pass is no longer listed as counsel for the defendants,

26   any order directing him to abide by these regulations would be moot.

27   ――――――――――

28   [1] A notice of change of designation of counsel was filed on September 16, 2016, substituting
     Deputy Attorney General Kevin W. Reager for Stephen C. Pass. (ECF No. 42.)

3

1    For these reasons, plaintiff's motion will be denied.

2    **IV.    Plaintiff's Allegations**

3    In the complaint, plaintiff asserts two sets of allegations:

4    **A.    Neurogenic Bladder Dysfunction**

5    Plaintiff's first set of allegations concern his neurogenic bladder dysfunction, for which he
6    uses a suprapubic tube that requires regular cleaning so as to prevent clogging and infection. On
7    multiple occasions, the institution did not have proper medical supplies to replace plaintiff's
8    clogged tube. Nurse Jolley and Dr. Quach also denied plaintiff the opportunity to go to a nearby
9    hospital due to financial concerns. Despite informing Nurse Mallory, Nurse Harper and Nurse
10   Jennings of his problems, plaintiff was not provided with the medical supplies that he needed
11   and/or these individuals attempted to cover-up the conduct of their staff. When plaintiff was
12   offered one type of catheter in response to the clogging, he claims this type was unsuitable for his
13   needs and caused unnecessary suffering.

14   **B.    Heart Disease**

15   Plaintiff's second set of allegations relates to his heart disease. In October 2013, plaintiff
16   suffered chest pains. When he notified custody staff, they spent over 1.5 hours attempting to
17   locate an EKG machine. In November 2013, plaintiff again suffered chest pain and again an EKG
18   machine could not be located. Plaintiff filed a grievance regarding this issue and requested that a
19   flatbed monitor and defibrillators be installed in his housing unit. Nurse Harper, Nurse Jennings,
20   and Nurse Mallory denied this request on financial grounds.

21   **V.    Undisputed Facts[2]**

22   At all times relevant to this action, plaintiff was an inmate housed at the California Health
23   Care Facility ("CHCF") in Stockton, California. Pl.'s Dep. at 35:20—37:25 (Decl. of S. Pass Ex.
24   B (ECF No. 32-2)).

25   The defendants were each employed at CHCF as follows:

26   ////

27

28   _____
     [2] All facts are undisputed unless otherwise noted.

- Dr. Truong Quach was employed as a physician and surgeon. He was assigned to the Standby Emergency Medical Services ("SEMS") unit as a treating physician. SEMS is a triage and treatment area where acute medical problems are assessed; it does not have a housing capacity. Decl. of Dr. T. Quach in Supp. Defs.' Mot. Summ. J. ("MSJ") (ECF No. 32-8) ¶¶ 3-4;

- Nurse Martha Jolley was employed as a nurse practitioner assigned to the High Acuity Medical Housing ("HAMH") Unit D5B. Decl. of M. Jolley in Supp. MSJ (ECF No. 32-6) ¶ 3;

- Nurse Phillip Mallory was employed as a Supervising Registered Nurse ("SRN") III where he planned, assigned, and directed the work of lower-level nursing staff. He was not responsible for supervising Unit D5B. Decl. of P. Mallory in Supp. MSJ (ECF No. 32-7) ¶ 4;

- Nurse Dixie Harper was employed as a SRN III where she was assigned to supervise nursing staff in HAMH, including Unit D5B. Decl. of D. Harper in Supp. MSJ (ECF No. 32-4) ¶¶ 3-4; and

- Nurse Allan Jennings was employed as the Chief Nursing Executive where he served as the functional supervisor of the Regional Chief of Nursing Services, the highest-ranking nurse manager within CHCF. Decl. of A. Jennings in Supp. MSJ (ECF No. 32-5) ¶ 3.

A.    **Introduction**

CHCF began operation in July 2013 and houses inmates who have the most severe and long-term needs. Jennings Decl. ¶ 4. CHCF operates as a skilled nursing facility, providing intermediate level care and complementing less acute treatment provided in other prisons operated by the California Department of Corrections and Rehabilitation ("CDCR"). Id. Within CHCF, plaintiff was housed in a high acuity housing unit, D5B, which is for patients needing regular assistance of a nurse. Jolley Decl. ¶ 3.

CHCF staff experienced problems obtaining medical supplies and had supply issues until approximately February or March 2014. Jennings Decl. ¶ 4; Jolley Decl. ¶ 4.

**B.      Plaintiff's Medical Conditions**

In 2005, plaintiff was diagnosed with a neurogenic bladder, and a suprapubic catheter was inserted in his bladder. Pass Decl. Ex. C (ECF No. 32-2 at 66-67). Since that time, plaintiff has had chronic bladder and urinary tract infections ("UTI") causing a number of problems, including clogging and encrustation of plaintiff's catheter. Id. (ECF No. 32-2 at 66-77). Since antibiotics alone were not resolving the problem, a specific protocol for the UTI was ordered by plaintiff's urologist, Dr. James Fawcett, which included starting medication, removing plaintiff from his environment, thoroughly cleaning the environment, cleaning plaintiff thoroughly, and then replacing his catheter and bag. See id. In an April 19, 2013, telemedicine report, Dr. Fawcett noted that obstructions in the catheter should be treated with a catheter change. Id. (ECF No. 32-2 at 72.) "For now, I would simply change the catheter as often as necessary to eliminate the obstructions. Do not flush the catheter; all that does is push the clogs back into the bladder, where they rest until they clog the next catheter. It is hoped that the encrustation and clogs will be removed with the catheter." Id.

Since that time, plaintiff has typically urinated through his urethra approximately twice per day even with a functioning catheter. Pl.'s Dep. at 46:6—49:23. The urination through the urethra is not planned; it just happens. Id. Since 2005, plaintiff has worn diapers to absorb urine from his urethral urinations, and he changes the diapers himself. Id. If his suprapubic catheter clogs, plaintiff can leak urine from the opening in his pelvis as well as his urethra. Id. The diapers capture the urine from both of these events. Id. When plaintiff's catheter clogs and urine leaks from his pelvis opening, plaintiff typically cleans himself with sanitary wipes. Id.

Per plaintiff, he also suffers from congenital coronary artery disease and congestive heart failure. Pass Decl. Ex. C (ECF No. 32-2 at 78-79, 144-45). He had multiple heart attacks and strokes before October 2013. Id. In addition, he had multiple clogged arteries in 2009 causing him to undergo cardiac catheterization and have 3 stents placed; heart failure in 2011; and blood clots in the apex of his heart in September 2012; and multiple lesions in his coronary tree. See id.

6

1          **C.     General Information about Catheters**[3]

2          Catheter size is measured by diameter using the French scale; it is abbreviated as "fr." A

3   16 fr. catheter is slightly smaller than an 18 fr.  The size difference between a 16 fr. and 18 fr.

4   catheter is less than 1 mm.  All adult size catheters are approximately 16" long and all of them

5   connect to the same universal drainage bags and tubes.

6          Catheter tips also come in different shapes:  straight and coude.  The coude tip catheter

7   has a slight curve which can make the catheter easier to insert through the urethra.

8          Indwelling catheters are left in place to drain the bladder continuously. They consist of a

9   rubber tube with a balloon around the circumference near the tip, which is placed in the bladder.

10  The balloon is inflated with saline solution after it is placed with the tip in the bladder, thus

11  making it larger than the opening the catheter was inserted through to prevent the catheter from

12  pulling out.  A balloon size of 5 cc. is standard and is used the majority of the time.  Balloon size

13  is non-critical if the opening used to place the catheter is a snug fit. Indwelling catheters are

14  connected to a drainage bag by a flexible tube that is the same size for all indwelling catheters.

15  While a coude tip is not necessary for placement through a stoma, it would do no harm to plaintiff

16  and would not significantly increase the risk of clogging from sediment.

17         An intermittent catheter is used to drain a bladder without leaving the catheter in place.  It

18  differs from an indwelling catheter because it does not have a balloon. After draining the bladder,

19  it is immediately removed.

20         A true suprapubic catheter is inserted with a needle into the bladder through the

21  abdominal wall.  For long-term suprapubic insertion, an opening to the bladder through the

22  abdominal wall, called a stoma, is created surgically. A Foley catheter is used for suprapubic

23  _____

[3] This general information is taken from the declaration of Nurse Mallory, who has "special
24  expertise concerning the placement of urinary catheters, including urethral and suprapubic
    placements." Mallory Decl. ¶¶ 2, 6a-e. Plaintiff opposes summary judgment by attempting to
25  create disputes of material fact by opining, inter alia, on the proper standard of care under the
    circumstances presented herein and the medical necessity of various instruments and medical
26  supplies. It is undisputed, though, that plaintiff is not a medical professional and is therefore not
    qualified to opine on these matters. See Pl.'s Dep. at 33:1—35:19 (ECF No. 32-2); Fed. R. Evid.
27  702. The court thus makes note of only those factual disputes that are supported by admissible
    evidence.
28

1   insertion through a stoma. A Foley catheter is also used for urethral insertion.

2         Foley catheters sold in kits as "suprapubic" contain a standard catheter as well as the

3   supplies commonly used for a suprapubic insertion through a stoma.  However, medical personnel

4   can simply assemble the supplies they require independently without using a kit to achieve the

5   same functional result.  Foley suprapubic kits typically are sold only in size 16 fr.  To obtain a

6   different size, such as an 18 fr., a provider would need to change the Foley catheter size in the kit

7   and connect that catheter to the universal drainage bag supplied in the kit.

8         For a patient with sediment in the urine or otherwise thickened urine, a larger catheter size

9   is less likely to clog.  However, the difference in size between a 16 fr. and an 18 fr. is quite small.

10   While a 16 fr. could be somewhat more prone to clogging than an 18 fr. over time, it would serve

11   as a medically adequate replacement for an 18 fr. catheter for a patient with sediment in his urine

12   if an 18 fr. was unavailable. It would simply need to be monitored more closely and potentially

13   flushed or changed more often than the 18 fr.

14       **D.**    **Plaintiff's Medical Treatment and Care at CHCF**

15           **1.**    **Arrival at CHCF and Initial Examination**

16         Plaintiff arrived at CHCF on October 1, 2013. Pl.'s Dep. at 33:4-8. On October 2, 2013,

17   Nurse Martha Jolley physically examined plaintiff and obtained his history since he was a new

18   arrival. Jolley Decl. ¶ 6a; Pass Decl. Ex. C (ECF No. 32-2 at 78-79). During this appointment,

19   Nurse Jolley assessed plaintiff as having many medical conditions, including hypertension,

20   diabetes mellitus type 2, elevated triglycerides, fatty liver, history of a seizure disorder, and

21   hypothyroidism. Jolley Decl. ¶ 6a. Nurse Jolley also noted that plaintiff had a neurogenic bladder

22   with suprapubic catheter and that he was taking medication for a urinary tract infection. Id. Nurse

23   Jolley did not have plaintiff's urology consultations during this appointment, so she planned to

24   have plaintiff's catheter changed when clogged or every 30 days, which Nurse Jolley considered

25   to be medically adequate based on her experience and training.[4] Id.

26   ////

27

28   _____
[4] Plaintiff disputes that plaintiff's medical records were unavailable to Nurse Jolley at this
appointment, but provides no basis for this assertion.

**2.      Care between October 5 and 9, 2013**

On October 4, 2013, Nurse Jolley was consulted by nursing staff regarding medication for plaintiff's heart condition. Jolley Decl. ¶ 6b. Nurse Jolley was unaware of any problems concerning plaintiff's suprapubic catheter at that time. Id. There is no record that plaintiff complained to any medical staff concerning his catheter that day. See Pass Decl. Ex. C (ECF No. 32-2 at 88.)

In the evening on October 5, 2013, Dr. Quach received a phone call from plaintiff's treating nurse after plaintiff had complained to the nurse that his suprapubic catheter was clogged. Quach Decl. ¶ 7a; Pass Decl. Ex. C (ECF No. 32-2 at 86). The nurse's examination of the catheter and abdominal insertion site showed no sign of infection and the catheter was draining 50 mL of clear yellow urine. Quach Decl. ¶ 7a. Dr. Quach contends plaintiff's medical files were not available to him at the time of this call. Id. ¶ 7b. Instead, he relied entirely on what the nurse told him. Id.

Dr. Quach ordered the nurse to flush plaintiff's suprapubic catheter with 20 cc's of normal sterile saline solution in order to evaluate if there was an actual blockage of the catheter. Quach Decl. ¶ 7b. Plaintiff claims Dr. Quach did this even after the nurse read to this defendant plaintiff's urologist's report recommending against flushing. Pl.'s Dep. at 63:17-25. Per Dr. Quach, the flush was a routine medical assessment technique to verify whether a catheter blockage actually exists. Quach Decl. ¶ 7c. It would not have been medically necessary to transfer a patient to SEMS or to an outside hospital for catheter replacement when a catheter obstruction had not been confirmed. Id. The potential cost of sending plaintiff to an outside facility was never a factor in Dr. Quach's decision-making process. Id. ¶ 8.

Nursing notes show that the staff flushed the suprapubic catheter as Dr. Quach ordered, and that plaintiff did not complain of any pain and was calm and cooperative. Pass Decl. Ex. C (ECF No. 32-2 at 86). The records further show that plaintiff's catheter drained 50 cc's of urine on the night of October 5, 2013, and 400 cc's of urine on the morning of October 6, 2013. Id. (ECF No. 32-2 at 88-89). These are within the normal range for each 8 hour period. Quach Decl. ¶ 7e.

On October 7, 2013, Physician's Assistant ("PA") Warhover changed the timing of plaintiff's catheter changes from every 30 days to every 2 weeks. Pass Decl. Ex. C (ECF No. 32-2 at 95). Per plaintiff's medical notes, he was asked (presumably by nursing staff) whether he can have a different size catheter instead of 18 fr., to which plaintiff responded that he cannot. Id. (ECF No. 32-2 at 81).

On October 8, 2013, plaintiff was seen by Dr. B. Barnett, who noted that plaintiff's catheter had been clogged but was now draining well. Pass Decl. Ex. C (ECF No. 32-2 at 96). He also noted that the catheter should be changed every two weeks. Id.

Nurse Jolley, who typically worked Wednesdays through Saturdays, would have next worked between October 9 and October 12. See Jolley Decl. ¶ 3. Plaintiff claims that at two points between October 5 and 10, he informed Nurse Jolley that his catheter was leaking and that he was in pain. Pl.'s Dep. at 60:1—63:2. He asked that it be changed or he be sent to a hospital. Id. The first time, Nurse Jolley said, "We don't have supplies. And it costs a lot of money for us to send you to the hospital." Id. at 60:20-25. The second time, Nurse Jolley walked out and slammed the door. Id. at 62:16—63:2.

### 3.     October 10, 2013, Catheter Change

Nurse Jolley disputes plaintiff's claims regarding her response to his complaints and asserts that the next time that she was involved in his care after October 4 was on October 10. That day, nursing staff informed Nurse Jolley that plaintiff was complaining about a clogged catheter again and that, while plaintiff claimed to be in pain, he appeared to be in no physical distress and was calm and cooperative with unlabored breathing. Jolley Decl. ¶ 6c; Pass Decl. Ex. C (ECF No. 32-2 at 99-100). Staff wanted to change plaintiff's 18 fr. catheter with a size 16 fr. because that was the only available size, but plaintiff refused, claiming that a 16 fr. was more likely to clog. Pass Decl. Ex. C (ECF No. 32-2 at 99-100.) He also refused a straight 18 fr. catheter[5] as unacceptable, and he refused to allow nursing staff to flush the catheter or irrigate the bladder due to his urologist's recommendation; plaintiff claims he showed nursing staff his

---

[5] A straight catheter differs from a standard catheter in that it does not have a balloon to secure it. Jolley Decl. ¶ 6c.

1    urologist's order. Id.; Pl.'s Dep. at 52:12-19. Nursing staff noted that there was no urine leaking

2    from plaintiff's stoma but his urethra was leaking. Pass Decl. Ex. C (ECF No. 32-2 at 99-100.)

3    Plaintiff's bladder was not distended. Id.

4           Nurse Jolley declares that she offered plaintiff a straight catheter as a temporary measure

5    to be secured by other means, but plaintiff refused and asked instead to be sent to an outside

6    hospital for a catheter change. Jolley Decl. ¶ 6c. Nurse Jolley then reviewed plaintiff's recent

7    medical records, including Dr. Barnett's notes from just a couple days earlier. Id. ¶ 6d. She wrote

8    a progress note regarding the lack of supplies and sent an email to Dr. Stephen Tseng, Chief

9    Physician and Surgeon at CHCF, requesting help in resolving plaintiff's catheter issue. Jolley

10   Decl. ¶ 6e; Pass Decl. Ex. E (ECF No. 32-2 at 101, 140). She informed Dr. Tseng that plaintiff

11   needed a suprapubic catheter change but that CHCF did not have the right size (18 fr.) and the

12   patient refused any other size because a smaller catheter could not handle the sediment. Pass

13   Decl. Ex. E (ECF No. 32-2 at 140). "He wants to go out, Hx getting encrusted and blocked w

14   sediment. Some leaking from urethra, none from os, bladder not distended. Offered 18 fr. straight

15   catheter which we would attempt to secure, but he refused. … Dr. Barnett saw him Tuesday,

16   noted same thing and wrote he would address at HW. Now what?" Id.

17          Dr. Tseng responded to the email and copied Nurse Harper and Nurse Jennings. Pass

18   Decl. Ex. E (ECF No. 32-2 at 140). He wrote: "Unless the catheter actually becomes obstructed,

19   we need to only treat what is medically necessary. Dr. Barnett told us that it wasn't obstructed at

20   the time if [sic] his evaluation." Id. Dr. Tseng then asked Nurse Jennings if "we need to elevate

21   this case as an issue where we have supply issues, but cannot obtain them. Is there anything you

22   can do to obtain the needed supplies?" Id. Nurse Jennings responded that CHCF can always get

23   emergent supplies from San Joaquin General Hospital, "but if we know we are getting patients

24   with special requirements then we just need to order them before the patient gets here." Id.

25          Nurse Jolley denied plaintiff's request to be sent to an outside hospital as medically

26   unnecessary since he did not appear to be in any distress, his bladder was not distended, and he

27   was not experiencing fever or chills. Jolley Decl. ¶ 6h. CHCF nursing staff had the ability to

28   change his catheter with either a 16 fr. or an 18 fr. straight catheter and could also irrigate his

catheter and bladder. Id. Nurse Jolley denies that the potential cost of sending plaintiff to an outside facility in any way influenced her decision. Id. ¶ 7. Plaintiff disputes this latter claim, alleging that Nurse Jolley denied his request to be sent outside after stating, "Sending you to the hospital cost too much money." Pl.'s Opp'n at 6.

After learning that plaintiff refused a 16 fr. catheter and that no Foley 18 fr. catheters were available, Nurse Mallory obtained a Foley 18 fr. catheter with a straight tip from an outside hospital and personally took it to plaintiff's unit. Mallory Decl. ¶ 6f. There, he placed it in plaintiff's bladder through a stoma before 6:00 p.m. on October 10, 2013. Pass Decl. Ex. E (ECF No. 32-2 at 187). The catheter replacement was uncomplicated, plaintiff did not complain, and the catheter functioned well as evidenced by clear urine collected in the universal drainage bag. Mallory Decl. ¶ 6f.

On October 11, 12, and 13, 2013, plaintiff's suprapubic catheter was performing normally, and he had no complaints associated with it. See Pass Decl. Ex. C (ECF No. 32-2 at 104-07).

### 4.      October 16, 2013, Inmate Grievance

On October 16, 2013, plaintiff filed a CDCR 602 Patient/Inmate Health Care Appeal, Log. No. 13000148, concerning the lack of medical equipment and supplies at CHCF. Defs.' Mot. Summ. J. Ex. D (ECF No. 32-2). Plaintiff's grievance included claims related to both his bladder condition and his heart condition. First, plaintiff claimed that his suprapubic tube got clogged on October 5, 2013, but that there were no suprapubic kits available at CHCF. When he asked Dr. Quach and Nurse Jolley to be sent to a nearby hospital to be treated, his request was denied. On October 10, 2013, plaintiff's catheter was finally replaced. Second, plaintiff claimed that he experienced chest pain and difficulty breathing on October 14, 2013. The nursing staff was unable to locate an EKG, and it took them 1.5 hours and "[h]undreds of phone calls" to locate one. In addition, a defibrillator was stored in another building.

By way of relief, plaintiff sought an EKG machine and defibrillator for each Acute Housing Unit as well as suprapubic kits size 18 fr. and additional bedtime leg bags to be stored in D5B permanently.

////

**5.      October 27, 2013, Plaintiff's Letter**

On October 27, 2013, plaintiff wrote to Oliver Lau, the Chief Medical Officer at CHCF, complaining about the conduct of a number of medical staff members, including Nurse Jolley and Dr. Quach. Pass Decl. Ex. E (ECF No. 32-2 at 144). Plaintiff claimed, for example, that Nurse Jolley denied plaintiff access to an outside hospital between October 5 and 10, 2013, despite knowing that plaintiff was in great pain and was urinating on himself. Id. Plaintiff also claimed that Nurse Jolley failed to respond at all when plaintiff had difficulty breathing on October 15 and 17, 2013. Id. Plaintiff forwarded a copy of this letter to a number of people and entities, including the Prison Law Office ("PLO").[6] See id.

**6.      October 30, 2013, First Level Response to Grievance**

Plaintiff was interviewed regarding the claims in Appeal Log No. 13000148 on October 30, 2013. Pass Decl. Ex. D. The reviewing SRN II partially granted the grievance after noting that "as of 10/30/13, prior to I/P interview, suprapubic catheter kit nor Foley catheter was not [sic] available for the inmate/patient." Id. It was granted to the extent that "[a]ll medical supplies that are needed for patient use as ordered by the MD shall be provided by this institution/facility." Id. The grievance was also forwarded to the "SRN III or DON level for reevaluation and procurement purposes." Id.

Nurse Mallory reviewed the grievance on October 30, 2013. Mallory Decl. ¶ 6g. He then approved it because the first level response seemed medically appropriate. Id. Nurse Mallory also signed off on it in light of the referral to an SRN III for reevaluation of the issue of plaintiff's requests, suggesting that "someone would further review the issue to see if what [plaintiff] was requesting was medically necessary." Id.

////

////

---

[6] The Prison Law Office describes itself as "a nonprofit public interest law firm … that provides free legal services to adult … offenders to improve their conditions of confinement." See Prison Law Office, About Us, prisonlaw.com/about-us/. Notably, the PLO litigated the class action lawsuit, Plata v. Schwarzenegger, which resulted in a receivership to ensure that CDCR provided constitutionally adequate medical treatment to state inmates. See 603 F.3d 1088 (9th Cir. 2010).

### 7.  November 7, 2013, Investigation of Supply Issues

In the fall of 2013, medical supply technicians at CHCF investigated the supply issues and reported their findings to Nurse Jennings. Jennings Decl. ¶ 5. In early November 2013, Nurse Jennings learned that the catalog that the facility staff was using to order supplies had been revised and the revised catalog had changed some bar codes from the earlier catalog. Id. On November 7, 2013, Nurse Jennings sent an email to supply staff in an ongoing attempt to rectify the problem. Id. While it appears that plaintiff's catheter supplies were not affected by the changed bar codes, see Pass Decl. Ex. E (ECF No. 32-2 at 141-42), the email did note that 18 fr. Foley catheters were out of stock. See id.

### 8.  November 13, 2013, Appeal to Second Level of Review

On November 13, 2013, plaintiff appealed the decision of the first level of review, claiming that an 18 fr. tube was again unavailable to him on October 25, 2013, and that his tube got clogged again on October 30, 2013. Pass Decl. Ex. D. When he asked to be transferred to a hospital for care, Nurse Jolley denied his request. Id. Plaintiff claimed that his tube was not changed until November 5, 2013. Id.

Nursing notes reveal that plaintiff's suprapubic catheter was leaking on November 13, 2013, and he requested that it be changed, but supplies were unavailable. Pl.'s Opp'n (ECF No. 38-1 at 21).

### 9.  November 19, 2013, Catheter Change

On November 18, 2013, PA Warhover sent an email to, inter alia, Nurse Harper, Nurse Mallory, and Nurse Phillip requesting help because plaintiff was due for another catheter change but CHCF did not have the necessary supplies for the change. Pass Decl. Ex. E (ECF No. 32-2 at 148-49).  Nurse Mallory responded that he would be happy to place a catheter for plaintiff anytime and that he can always get supplies. Id.

On November 19, 2013, Nurse Mallory delivered a Foley 18 fr. catheter with a straight tip to plaintiff's unit for staff to use for his catheter change. Mallory Decl. ¶ 6h. This was the same configuration that Nurse Mallory had used in plaintiff on October 10, 2013. See Pass Decl. Ex. E (ECF No. 32-2 at 126). Later that day, Nurse Mallory received an email from Nurse Cyril Destajo

14

advising that plaintiff was refusing to allow him to place the Foley 18 fr. catheter because the tip was curved.[7] Pass Decl. Ex. E (ECF No. 32-2 at 126).

### 10. November 25, 2013, Request for Information from PLO

On November 25, 2013, the PLO sent a letter to CHCF regarding plaintiff's supply issues. Pass Decl. Ex. E (ECF No. 32-2 at 189-90). The PLO asked for information regarding the current medical order for plaintiff's catheters and related supplies, including number and type; the process at CHCF for plaintiff to receive his catheters and related supplies, including whether a stock of all such supplies are kept or can be kept in the building where he is housed; and whether plaintiff was appropriately evaluated for complaints of chest pain on November 8, 2013. Id.

In response to the PLO's letter, Ann Her, an office technician in the office of Dr. Galen Church, Chief Physician and Surgeon at CHCF, wrote an email on November 27, 2013, to a number of individuals, including Nurse Jolley. Pass Decl. Ex. E (ECF No. 32-2 at 129-31). The email recipients were asked to provide the information sought by the PLO. See id. PA Warhover responded that "Nursing has been unable to obtain supplies despite multiple emails to nursing supervisors." Pass Decl. Ex. E (ECF No. 32-2 at 129).

### 11. December 18, 2013, Email Exchange and Catheter Change

On December 18, 2013, Melissa Keville, a health program specialist at CHCF, emailed Nurse Mallory asking for additional information for her response to the PLO. Pass Decl. Ex. E (ECF No. 32-2 at 132). Ms. Keville indicated that plaintiff had not been receiving his requested and necessary supplies relating to his suprapubic catheter, even though "an order has been placed numerous times requesting appropriate catheters." Id. Ms. Keville asked if Nurse Mallory was familiar with these issues and asked what the process is for plaintiff to receive his catheters and related supplies, including whether there is a stock of these supplies that can be kept in the building where he is housed. Id.

Nurse Mallory responded to Ms. Keville and copied Nurse Harper since the latter was the

---

[7] The court acknowledges the conflict on this issue. While Nurse Mallory indicates that he provided a *straight* tip catheter on November 18, just as he did on October 10, Nurse Destajo advised that plaintiff was refusing because the tip was *coude*.

SRN III over plaintiff's housing unit. Pass Decl. Ex. E (ECF No. 32-2 at 133). Nurse Harper wrote that she was currently working on the response to plaintiff's second level appeal on the same issues and would respond to Ms. Kelville the following day. Id. (ECF No. 32-3 at 134). In light of Nurse Harper's response, Nurse Mallory took no further action in responding to Ms. Kelville's email. Mallory Decl. ¶ 6k.

The evening of December 18, 2013, Nurse Mallory was at his weekly meeting with Dr. Church concerning PLO inquiries, and plaintiff came up as a patient of concern. Mallory Decl. ¶ 6l. Nurse Mallory was surprised to hear that plaintiff's catheters were still an issue. Id. He had offered to supply catheters for plaintiff when needed, so he believed that the issue with the catheters had been resolved. Id. Nurse Mallory told Dr. Church that he would take care of plaintiff's catheter issue that evening and that CHCF could report to the PLO that Nurse Mallory would personally ensure that there were sufficient 18 fr. catheters in plaintiff's housing unit going forward. Id.

Immediately after his meeting with Dr. Church, Nurse Mallory went to Unit D5B and personally changed plaintiff's catheter with a suitable Foley 18 fr. straight tip. Mallory Decl. ¶ 6m. While Nurse Mallory was changing his catheter, plaintiff accused him of lying and said that Nurse Mallory had instructed nursing staff to place a coude catheter on November 19, 2013.  Id. He threatened to have his lawyers subpoena Nurse Mallory for denying him medical care. Id.

Later that evening, Nurse Mallory emailed Nurse Jennings and Dr. Church concerning plaintiff. Pass Decl. Ex. E (ECF No. 32-2 at 148). Nurse Mallory expressed surprise that plaintiff was still experiencing supply issues since he was led to believe that PA Warhover took care of the issue in November. Id. Nurse Mallory then stated that he would personally ensure that there were enough supplies in plaintiff's housing unit moving forward. Id.

### 12.     December 19, 2013, Telemedicine Conference

On December 19, 2013, plaintiff had a teleconference with an "R. Bul." Pass Decl. Ex. E (ECF No. 32-2 at 191). Per the notes of this conference, plaintiff stated that he needed the suprapubic catheter, which he claimed should be changed every two weeks. R. Bul explained to plaintiff that he did not need a suprapubic catheter. This individual also spoke to a urologist, who

recommended changing the catheter every 8-12 weeks. "The more often you change, risk of infection is higher. Recommendation is to change it 8-12 weeks." Id.

### 13.    December 27, 2013, Second Level of Review

During the investigation of plaintiff's second level appeal, Nurse Harper learned that staff was using the incorrect catalog to order supplies. On December 27, 2013, she sent an email of "High" importance to Nurse Jolley, Nurse Jennings and Nurse Mallory, among others, regarding plaintiff's grievance. Pass Decl. Ex. E (ECF No. 32-2 at 150). Nurse Harper wrote that she has become aware that the staff are not using the current version of the supply catalog to order certain items and that the 18 fr. Foley catheters were not in the version of the catalogs that the staff were ordering from. Id. She also wrote that while plaintiff wants an 18 fr. suprapubic catheter to be used instead of the Foley catheter, only a 16 fr. suprapubic catheter was available for ordering, not the 18 fr. Id. In addition, while plaintiff requested that a whole suprapubic kit be used, Nurse Harper, after consultation with Nurse Jolley and Nurse Mallory, determined that only an 18 fr. Foley catheter was needed. Id.

Also on December 27, 2013, Nurse Harper granted plaintiff's appeal at the second level of review. Pass Decl. Ex. D. During plaintiff's interview with Nurse Harper that day, plaintiff was informed that there is a defibrillator on each unit and an EKG machine in each building and that nursing staff would be "in serviced regarding where the EKG machines were located as well as signs posted as to the locations on each unit." Id. Regarding the suprapubic catheters, Nurse Harper blamed the lack of available supplies for the catheter changes on the nursing staff's failure to order from the current catalog, and she indicated that the issue was resolved as of the interview date. Id. As to plaintiff's request for "18 fr. Suprapubic kits," Nurse Harper noted that these kits were unavailable and unnecessary, but that an order for the correct catheters ("18 fr. Foley Catheters") was placed as of the interview date and would be supplied to plaintiff as soon as they were delivered. Id. Finally, Nurse Harper personally provided two additional 18 fr. Foley catheters to plaintiff's housing unit for his next two catheter changes pending receipt of the newly ordered catheters. Id.

////

1    Although Nurse Harper believed that standard 5cc. balloon 18 fr. Foley catheters were

2    medically adequate for plaintiff's needs, she made multiple attempts to locate 10 cc. balloons in

3    an effort to appease plaintiff. Harper Decl. ¶ 6j. Accordingly, on December 31, 2013, Nurse

4    Harper wrote an email to nursing staff to "please check to ensure that a 19 fr. Foley cath w/10 Cc

5    balloon is available for [plaintiff]'s cath change on Thursday (D5B)…." Pass Decl. Ex. E (ECF

6    No. 32-2 at 183).

7                        **14.      January 2, 2014, Catheter Change**

8            Despite submitting an order for the 10 cc. balloon catheters on December 27, 2013, CHCF

9    had not yet received the order by plaintiff's January 2, 2014, catheter change. See Pass Decl. Ex.

10   E (ECF No. 32-2 at 129, 182). Nurse Harper was only able to locate an 18 fr. Foley catheter with

11   a 5cc. balloon. See id. (ECF No. 32-2 at 129). She wrote in an email to various staff members that

12   day that she "had to keep asking and searching every day to make sure it was done timely today"

13   and that she hoped "we are able to obtain the F/C supplies timely next time for his cath change in

14   2 weeks…please keep me updated on when the order arrives to the unit." Id. After this catheter

15   was inserted, Nurse Harper wrote in another email that plaintiff "did not complain anything, he is

16   happy but just preferred 10 cc balloon." Id. A nursing staff member informed Nurse Harper that

17   "[w]e will make sure we obtain all necessary FC supplies before his cath change in two weeks."

18   Id. (ECF No. 32-2 at 184).

19                       **15.      January 4, 2014, Appeal to Director's Level of Review**

20           Plaintiff appealed the second level decision on January 4, 2014. Pass Decl. Ex. D. Plaintiff

21   claimed that suprapubic kits are provided to other inmates in different sizes and they are thus

22   available to be provided to plaintiff. He claimed that Nurse Mallory, Nurse Harper, and Nurse

23   Jolley are not licensed doctors to override the orders of plaintiff's urologist. He also claimed for

24   the first time that the decision of Nurse Jolley and Dr. Quach in October 2013, and Nurse Jolley

25   again in November 2013 to deny plaintiff access to a hospital due to financial considerations was

26   deliberately indifferent to his medical needs. Lastly, plaintiff claimed that Nurse Harper's denial

27   of his request for an EKG machine was due to financial considerations.

28   ////

**16.**     **April 10, 2014, Denial at Director's Level of Review**

Plaintiff's appeal was denied at the Director's Level of Review on April 10, 2014. Pass Decl. Ex. D. The appeal was denied as to the EKG machine and defibrillators on the ground that there was no medical indication for plaintiff's requests. Concerning the suprapubic catheters, the third level of review noted that a physician's order dated March 22, 2014, "was completed for [plaintiff's] suprapubic 18 fr. catheter to be changed as needed for occlusion or excessive sediment every ten days and for lidocaine gel 2% to be used to facilitate insertion."

## IV.     Legal Standards

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).

Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

1   Summary judgment should be granted, "so long as whatever is before the district court

2   demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

3        If the moving party meets its initial responsibility, the burden then shifts to the opposing

4   party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec.

5   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the

6   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

7   of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

8   admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P.

9   56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in

10  contention is material, i.e., a fact "that might affect the outcome of the suit under the governing

11  law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific

12  Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e.,

13  "the evidence is such that a reasonable jury could return a verdict for the nonmoving party,"

14  Anderson, 447 U.S. at 248.

15       In the endeavor to establish the existence of a factual dispute, the opposing party need not

16  establish a material issue of fact conclusively in its favor. It is sufficient that "'the claimed

17  factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

18  truth at trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank v. Cities Serv. Co.,

19  391 U.S. 253, 288-89 (1968). Thus, the "purpose of summary judgment is to pierce the pleadings

20  and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475

21  U.S. at 587 (citation and internal quotation marks omitted).

22       "In evaluating the evidence to determine whether there is a genuine issue of fact, [the

23  court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls

24  v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is

25  the opposing party's obligation to produce a factual predicate from which the inference may be

26  drawn. Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to

27  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

28  some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations

1  omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

2  non-moving party, there is no 'genuine issue for trial.'"  Id. at 587 (quoting First Nat'l Bank, 391

3  U.S. at 289).

4  **VI.    Analysis**

5      **A.    Eighth Amendment Medical Indifference**

6          While the Eighth Amendment of the United States Constitution entitles plaintiff to

7  medical care, the Eighth Amendment is violated only when a prison official acts with deliberate

8  indifference to an inmate's serious medical needs. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir.

9  2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir.

10  2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091,

11  1096 (9th Cir. 2006).

12          In order to prevail on his Eighth Amendment claim, plaintiff must show "(1) a serious

13  medical need by demonstrating that failure to treat [his] condition could result in further

14  significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's

15  response to the need was deliberately indifferent." Wilhelm, 680 F.3d at 1122 (citing Jett, 439

16  F.3d at 1096). Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a

17  prisoner's pain or possible medical need, and (b) harm caused by the indifference." Id. (citing

18  Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails

19  more than ordinary lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks

20  omitted); Wilhelm, 680 F.3d at 1122.20

21          The gravamen of plaintiff's claim is that the defendants were deliberately indifferent to his

22  medical needs by failing to ensure the availability of necessary medical supplies for plaintiff's

23  neurogenic bladder disease and heart condition and by failing to adequately manage and treat his

24  neurogenic bladder disease. There is no dispute that plaintiff's conditions constitute a serious

25  medical need under the Eighth Amendment. Therefore, the only question before the court is

26  whether the conduct of any of the defendants amounted to deliberate indifference.

27          Defendants seek summary judgment on the ground that none of them was deliberately

28  indifferent to plaintiff's medical needs. A prison official is deliberately indifferent only if he or

1    she knew of and disregarded an excessive risk to plaintiff's health. Colwell, 763 F.3d at 1066.

2    This element focuses on the individual defendant's mental attitude. Toguchi v. Chung, 391 F.3d

3    1051, 1057 (9th Cir. 2004).

4         To prevail on his Eighth Amendment claim, plaintiff does not have to prove that he was

5    completely denied of medical care because deliberate indifference can be shown where "prison

6    administrators or physicians denied, delayed, or intentionally interfered" treatment or by the way

7    prison staff delivered medical care. Snow, 681 F.3d at 986. Rather, plaintiff "must show that the

8    course of treatment the doctors chose was medically unacceptable under the circumstances and

9    that the defendants chose this course in conscious disregard of an excessive risk to [his] health."

10   Snow, 681 F.3d at 988 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)) (internal

11   quotation marks omitted).

12        "A difference of opinion between a physician and the prisoner—or between medical

13   professionals—concerning what medical care is appropriate does not amount to deliberate

14   indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989));

15   Wilhelm, 680 F.3d at 1122-23 (citing Jackson, 90 F.3d at 332). Nonetheless, the failure to follow

16   the recommendation of a treating specialist may constitute deliberate indifference. Snow, 681

17   F.3d at 987.

18              **1.    Dr. Quach**

19        Dr. Quach's interaction with plaintiff was limited to a single incident on October 5, 2013,

20   when a nurse called Dr. Quach after plaintiff complained that his suprapubic catheter was

21   clogged. Construing the facts in plaintiff's favor, Dr. Quach ordered a flush of plaintiff's

22   suprapubic catheter with saline solution even after he was informed of an urologist's directive to

23   not flush. While these conflicting versions create a dispute of fact, the dispute is ultimately

24   immaterial because plaintiff has not shown any harm attributable to Dr. Quach's order. Jett, 439

25   F.3d at 1096 (deliberate indifference is "satisfied by showing (a) a purposeful act or failure to

26   respond to a prisoner's pain or possible medical need and (b) *harm caused by the indifference*.")

27   (emphasis added).

28   ////

1  Although plaintiff attributes a number of subsequent ailments to defendants' general

2  conduct, he submits no evidence directly or even remotely attributable to Dr. Quach's order.

3  Plaintiff's unsupported allegations are insufficient to defeat summary judgment. This conclusion

4  is further supported by the record, which reveals no complaints of pain following the nurse's

5  flush, medical notes that plaintiff was calm and cooperative, normal drainage of plaintiff's

6  catheter drained that evening and the following morning, and the fact that it remained unclogged

7  through Dr. Barnett's October 8, 2013, examination. Dr. Quach is therefore entitled to summary

8  judgment.

9  ### 2.   Nurse Martha Jolley

10  Plaintiff's claim against Nurse Jolley arises from her treatment of his blocked catheter and

11  her alleged refusal to transfer plaintiff to a hospital for a catheter change on financial grounds.

12  Construing the facts in plaintiff's favor, Nurse Jolley twice denied plaintiff's request to be

13  sent to an outside facility for a catheter change, one time citing financial concerns. Assuming that

14  plaintiff informed this defendant twice that he was in pain and needed a catheter change, and this

15  medical defendant opted for a different course of treatment than that suggested by plaintiff,

16  plaintiff has shown nothing more than a difference of opinion with his medical provider. To

17  establish a difference of opinion rising to the level of deliberate indifference, "plaintiff must show

18  that the course of treatment the doctors chose was medically unacceptable under the

19  circumstances." Jackson, 90 F.3d at 332. In addition, he must show that it was chosen "in

20  conscious disregard of an excessive risk to [the prisoner's] health." Id. (citation omitted). Plaintiff

21  has not raised a material question of fact regarding this issue.

22  Plaintiff also fails to show that Nurse Jolley ignored the directives of plaintiff's urologist.

23  There is simply no evidence in the record that Nurse Jolley was even aware of them as they relate

24  to the size and type of catheter that plaintiff claims he needed. Instead, the facts establish only

25  that (1) the urologist's records were unavailable to Nurse Jolley during the October 2 initial

26  evaluation; (2) nursing staff informed Nurse Jolley on October 10 that plaintiff's refusal of a

27  catheter *irrigation* was based on the recommendation of his urologist; and (3) Nurse Jolley

28  reviewed plaintiff's recent medical records on October 10, not his entire medical file.

1    In other words, there is no evidence that this defendant was aware of any protocol to

2    follow or the urologist's recommendation for a specific size or type of catheter. "If a [prison

3    official] should have been aware of the risk, but was not, then the [official] has not violated the

4    Eighth Amendment, no matter how severe the risk." Toguchi, 391 F.3d at 1057 (internal citations

5    omitted). "Mere negligence in diagnosing or treating a medical condition, without more, does not

6    violate a prisoner's Eighth Amendment rights." McGuckin, 974 F.2d at 1059 (alteration and

7    citation omitted). In addition, the sole report that plaintiff relies in support of his claim that his

8    urologist ordered 18 fr. Foley catheters is a March 2013 telemedicine report where his urologist

9    observed the presence of "an 18-French Foley catheter." See Pass Decl. Ex. B (ECF No. 32-2 at

10   68). This observation is hardly a directive regarding a particular type or size of catheter.

11   Summary judgment should therefore be entered for this defendant.

12              **3.      Nurse Dixie Harper**

13   Plaintiff's claim as to Nurse Harper is based on her processing of his appeal at the second

14   level of review. Generally, there is no federal constitutional right to a prison administrative appeal

15   or grievance system for California inmates. See Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir.

16   2003). Prison officials' actions in reviewing and denying inmate appeals generally cannot serve

17   as a basis for liability under § 1983. Id. To the extent plaintiff claims that Nurse Harper's

18   determinations were medically unacceptable, the evidence does not support this.

19   The facts before the court demonstrate that during the course of reviewing the appeal,

20   Nurse Harper learned of the cause of CHCF's ongoing problems in obtaining them. In response,

21   Nurse Harper immediately sent an email of "High" important instructing supervisors and

22   providers to order from the correct catalog, and she provided the staff the correct order numbers

23   for 18 fr. catheters. While Nurse Harper did not think that prepackaged suprapubic kits were

24   medically unnecessary, she determined that an 18 fr. Foley catheter was medically adequate and

25   she then personally dropped off two standard catheters with 5 cc. balloons to plaintiff's housing

26   unit to ensure that he received his next two changes in a timely manner. Lastly, even though

27   Nurse Harper determined that standard 5cc. balloon 18 fr. Foley catheters were medically

28   adequate for plaintiff's needs, she nonetheless made multiple attempts to locate 10 cc. balloons in

24

an effort to appease plaintiff. Defendants' medical expert opines that this course of treatment offered by Nurse Harper was medically acceptable. Decl. of Dr. A. Enenmoh in Supp. MSJ ¶ 3d (ECF No. 32-3). Plaintiff has not rebutted this evidence.

Regarding plaintiff's requests for a defibrillator and an EKG machine, Nurse Harper notified plaintiff that there was a defibrillator in his unit, that there was an EKG machine available to him in each building, and that she would instruct staff on the location of the machines. Defendants' medical expert opines that an EKG machine and a defibrillator in each housing unit were not medically necessary. Dr. Enenmoh Decl. ¶¶ 3a-b. He also opines that the standard of care provided to plaintiff by Nurse Harper in response to his heart condition was within the accepted standard of care. Id. ¶ 3b. Plaintiff has again failed to rebut this evidence.

Plaintiff spends a considerable portion of his opposition opining on the proper course of treatment for his medical issues. A recurring problem for plaintiff is that he is not a medical expert and is therefore not qualified to opine on the proper catheter for his medical needs, the proper manner of insertion, who is best qualified to treat him, or how many EKG machines or defibrillators should be placed on each floor. See Fed. R. Evid. 702. In fact, other than his own opinion, he has submitted no evidence that defendant's conduct was medically unacceptable, or that any of the defendants performed their duties in conscious disregard of an excessive risk to plaintiff's health.

Summary judgment should therefore be entered for Nurse Harper.

#### 4.    Nurse Phillip Mallory

Nurse Mallory was involved in plaintiff's care as follows: (1) the October 10, 2013, replacement of plaintiff's catheter; (2) the October 30, 2013, approval of the first level of review decision; (3) the November 19, 2013, delivery of a 18 fr. Foley catheter with a straight tip to plaintiff's unit for a catheter change; (4) the December 18, 2013, forwarding of Ms. Keville's email to Nurse Harper; (5) the December 18, 2013, change of plaintiff's catheter and personal assurance regarding the availability of future catheters; and (6) the December 27, 2013, consultation with Nurse Harper regarding plaintiff's appeal to the second level of review, and his determination that a suprapubic kit was unnecessary.

During his deposition, plaintiff limited the scope of his claim against Nurse Mallory to his participation in "downgrading" plaintiff's appeal at the second level of review. See Pl.'s Dep. at 81:9-19. This claim is premised on Nurse Mallory determination, along with Nurse Jolley and Nurse Harper, that suprapubic kits with 18 fr. Foley catheters were medically unnecessary, and that the number of EKG machines and defibrillators in each unit was adequate. As noted supra, there is no basis for liability under §1983 based solely on the processing of an inmate appeal.

Assuming plaintiff is asserting that Nurse Mallory's determinations at the second level of review were medically unacceptable and in violation of plaintiff's urologist's orders, he fails to meet his burden to overcome summary judgment for three reasons. First, none of the records from plaintiff's urologist included a directive regarding either suprapubic kits or catheter size. Second, plaintiff failed to submit any evidence that Nurse Mallory's determinations were medically unacceptable under the circumstances or were based on a conscious disregard of plaintiff's health.

Lastly, plaintiff has not shown any harm. The only harm attributed to Nurse Mallory's determination in relation to the catheter is a continuous growth of bacteria in his catheter, see Pl.'s Dep. at 84:20-23, but the record reveals that these problems pre-dated Nurse Mallory's involvement in plaintiff's care. In any event, there is no evidence—other than plaintiff's non-medical testimony—linking bacteria growth to Nurse Mallory. As for the EKG machine and defibrillator, the only harm identified by plaintiff is an increased risk for heart failure, but he again failed to submit any evidence linking Nurse Mallory's conduct to this future injury.

Summary judgment should therefore be entered for this defendant.

### 5.    Nurse Allan Jennings

Nurse Jennings never provided medical treatment or care to plaintiff. Rather, his involvement was limited to his review of Nurse Harper's December 27, 2013, second level response to plaintiff's administrative grievance. Relying on Nurse Harper's competence, findings and opinions, Nurse Jennings signed the second level response after determining that the available EKG machine and defibrillator were medically adequate, that a standard 18 fr. Foley catheter was adequate for plaintiff's needs, and that it appeared that Nurse Harper had resolved the supply problem. Defendants' medical expert has previously opined that Nurse Harper's

26

1  response to the second level of review was medically adequate, and plaintiff has offered no

2  evidence to rebut the expert's opinion. This defendant is thus also entitled to summary judgment.

3       In conclusion, while the undersigned is sensitive to plaintiff's medical condition and

4  needs, the record demonstrates only that a new facility experienced problems obtaining medical

5  supplies, that the defendants attempted to resolve the problem at multiple steps along the way,

6  and that the treatment options that were offered to plaintiff were medically adequate under the

7  circumstances. Although it is unfortunate that plaintiff experienced delays in the provision of

8  medical supplies, none of the defendants' conduct rises to the level of a constitutional violation

9  for the aforementioned reasons. Each defendant is therefore entitled to summary judgment. In

10 light of this recommendation, the undersigned declines to consider defendants' alternative

11 argument that they are entitled to qualified immunity.

12      **B.**     **California Claims**

13      Insofar as plaintiff asserts state law claims, defendants seek summary judgment on the

14 ground that plaintiff failed to comply with the California Government Claims Act ("CGCA").

15 The CGCA requires that a tort claim against a public entity or its employees be presented to the

16 California Victim Compensation and Government Claims Board, formerly known as the State

17 Board of Control, no more than six months after the cause of action accrues. Cal. Gov. Code, §§

18 905.2, 910, 911.2, 945.4, 950-950.2 (2006). Presentation of a written claim, and action on or

19 rejection of the claim, are conditions precedent to suit. State v. Superior Court of Kings County

20 (Bodde), 32 Cal. 4th 1234, 1245 (2004); Mangold v. California Pub. Utils. Comm'n, 67 F.3d

21 1470, 1477 (9th Cir. 1995). To state a tort claim against a public employee, a plaintiff must allege

22 compliance with the Government Claims Act. State v. Superior Court, 32 Cal.4th at 1245;

23 Mangold, 67 F.3d at 1477; Karim-Panahi v. Los Angeles Police Dept., 839 F.2d 621, 627 (9th

24 Cir. 1988).

25      Plaintiff has not alleged compliance, and there is no record that he filed a claim with the

26 California Victim Compensation Board. Since plaintiff has not responded to this argument in his

27 opposition, the undersigned will recommend that this portion of defendants' motion also be

28 granted.

**VII.**   **Conclusion**

Based on the foregoing, IT IS HEREBY ORDERED that:

1.   Plaintiff's March 24, 2016, "pre-trial motion" (ECF No. 27) is denied;

2.   Plaintiff's June 8, 2016, motion for court order (ECF No. 34) is denied;

3.   Plaintiff's June 8, 2016, motion for extension of time (ECF No. 35) is granted;

4.   Plaintiff's July 19, 2016, opposition is deemed timely filed; and

IT IS HEREBY RECOMMENDED that:

A.   Defendants' motion for summary judgment (ECF No. 32) be GRANTED; and

B.   The Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 3, 2017

/DLB7;
DB/Inbox/Substantive/hoff1009.msj.v2

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

28